Crosby v. Bolmar.

---

No. 23,774.

FLORA M. CROSBY, *Appellee,* v. C. P. BOLMAR, *Appellant,* and WILLIAM QUAIL, *Appellee.*

### SYLLABUS BY THE COURT.

REAL-ESTATE AGENTS—*Sale—Two Brokers Claiming Commissions—Proximate, Efficient and Procuring Cause of the Sale.* Two brokers each claimed the commission for the sale of real estate brought about by their joint efforts. *Held,* that the one whose diligence prevented the property from being withdrawn from the market for twenty-four hours, during which time he succeeded in bringing the parties to an agreement as to terms resulting in the sale, as a matter of law, was the proximate, efficient and procuring cause of the sale, and entitled to the commission.

Appeal from Shawnee district court, division No. 1; JAMES A. McCLURE, judge. Opinion filed July 8, 1922. Reversed.

*W. R. Hazen,* of Topeka, for the appellant.

*J. B. Larimer, Robert Stone, George McDermott, Robert Webb, Clad Hamilton,* and *Clay Hamilton,* all of Topeka, for the appellees.

The opinion of the court was delivered by

PORTER, J.: Mrs. Flora M. Crosby brought this action alleging that she owed a commission of $1,400 to either C. P. Bolmar or William Quail, defendants, for procuring a sale of certain real estate, and she asked that the defendants litigate between themselves which was entitled to the commission.

Issues were joined between the defendants; there was a trial and a verdict and judgment in favor of Quail, from which Bolmar appeals.

Mrs. Crosby owned business property on Kansas avenue known as the Rowley corner, which she listed, together with other property, with C. P. Bolmar on November 25, 1919. The Rowley property was priced at $55,000. The Farm Mortgage Trust Company was in the market for business property between 5th and 9th streets. Bolmar endeavored at different times to interest the company in the Rowley property and also offered other business properties which he had for sale or thought he could obtain the agency for. In February or March, 1920, William Quail procured from Mrs. Crosby the right to sell the Rowley property and another known as the Fullerton property. From that time. he was diligent in trying to sell to the mortgage company both properties or other property on Kansas avenue. At least two other real-estate agencies had the Rowley corner for sale and were endeavoring to sell it to the mortgage company. Both Bolmar and Quail submitted to the company different properties as well as the Rowley corner. On April 20, Bolmar saw J. E. Griest, secretary of the mortgage company, and again suggested the Rowley property. Griest asked him if he really had authority to sell the property. Bolmar produced the November letter from Mrs. Crosby and discovered that the offer was limited to thirty days, but he insisted that he had verbal authority from Mrs. Crosby extending his agency. Griest told him in substance that if he could sell the property for $55,000 he could go and see J. P. Slaughter, president, and Collingwood, one of the directors, and tell them that he, Griest, was in favor of buying. Bolmar did so and those officers spoke favorably of purchasing if certain terms could be agreed upon as to payments. Bolmar went at once to see Mrs. Crosby, who informed him that she had taken the property off the market and had written all the agents, including himself; and she handed him a carbon copy of the letters. His testimony is that he said to her, "I have been working on this thing ever since you sent me this letter in November. It seems to me kind of hard when I am almost on the eve of a sale to have it taken out of my hands." He asked her for an extension of twenty-four hours in which to sell the property and she consented. He told her what he had done with the Farm Mortgage Trust Com-

Crosby v. Bolmar.

pany and what they could do in the matter of payment. He testified that he said to her, "I will go down and present it to them and believe these terms will be satisfactory, and you have given me twenty-four hours and that I am the only person—in giving me an extension, practically it is out of the market except as to me." She said, "Mr. Bolmar, if any other of these agents who have this property for sale ask me for this extension of twenty-four hours, I will give it to them the same as I have given it to you." He went to Slaughter and Collingwood and informed them that she had accepted the proposition. They told him the board of directors was to meet the next day and asked him to be in his office about two o'clock. While the board of directors of the mortgage company was in session the next day he was called to the meeting; terms were agreed upon and a memorandum contract was signed by him, and the company's check for $5,000 handed to him, which he carried to Mrs. Crosby within the twenty-four hours, and the sale was completed.

Quail testified in substance that in February he presented to Mr. Slaughter for the company four different properties on Kansas avenue, including the Rowley corner, March 15. That Mr. Collingwood, vice president, thought it was too small and the price too high but told him they would take it up at the board meeting; that two or three days before the sale was made he was trying to get another property listed, and Collingwood and Slaughter promised that in case he did, they would look at it; that he "kept putting places up to them"; he didn't know what action they would take when the board met; that the board meeting was not a special meeting to consider the Rowley corner only; he was getting all the properties he could to submit to them at that meeting as he understood they were going to pick a location that night. He never knew just when the meeting was to be held but it was in the near future; the first thing he knew about the property having been sold was when he read it in the morning paper after the sale had been completed by Bolmar. Mrs. Crosby had given him no terms on which she would sell; "she just said she wanted $55,000 for the property"; he was then asked:

"Q. Then whether you could have sold the property to the mortgage company depended upon what terms she wanted, wouldn't it? A. Well, if I had the same show Mr. Bolmar had I could have found that out and if they had made me an offer on that property I could mighty soon have found out how much they would have to pay down and whether it would be accepted or

not. I suppose he had to go to her to find out the same as any other real-estate man.

. . . . . . . . . . . . . .

"Q. Did you have any idea about what the terms were? A. No, sir, because I did not have any.

"Q. Therefore, you couldn't give them any terms on it? A. No, sir."

Mr. Slaughter, president of the company, testified that he got his first notice of the Rowley property from Quail in February. "Between this time and the time we bought, he talked frequently with me about it and continued until the time the property was sold." The board met and bought the property April 20. Mr. Bolmar was called to the meeting; did not know by whom; after he came an informal contract was entered into between Mrs. Crosby and the company; that when it became apparent that the board was going to enter into the contract it occurred to him that he had two friends that were trying to sell the property to the company and he thought they were equally interested, "and I said, 'Hold on,' or words to that effect, 'Will Quail has been trying to sell this property to us and I think he is interested,' and Mr. Bolmar stated that he was the only one at this time that had the property for sale. . . . Then we went ahead and made the trade."

He was inclined to think that some other real-estate men mentioned the Rowley corner "to us, but these two men were the ones that were most active in trying to sell it to us." On cross-examination he testified that the company proposed to Mr. Bolmar to pay $5,000 earnest money and another substantial payment in thirty days and the balance as soon as title could be perfected; that the company had not submitted its terms to anybody before that meeting; a provisional contract was entered into, which Bolmar took to Mrs. Crosby for her to sign, and returned with the information that she would accept it; that when they finally concluded to accept the property they closed the deal with Bolmar and executed the contract with him as Mrs. Crosby's agent; that Bolmar stated at the meeting that Mrs. Crosby had given him twenty-four hours in which to sell the property.

"Q. That was one of the things that hurried you people up wasn't it? A. Well, we arrived at the conclusion to buy and I suppose that might have had some influence."

Clay Hamilton, attorney and director of the mortgage company, testified that Mr. Bolmar was called to the board meeting after it

was in session; the witness was present all the time until the meeting adjourned and didn't hear anything said by Mr. Slaughter or anybody else before the resolution to purchase the property was passed in regard to Mr. Quail having anything to do with the sale of the property; they were all sitting around the table close together.

Mr. Collingwood, vice president, testified that he did not remember of anything interrupting the transaction nor of anything said about Mr. Quail and believed that if anything had been said they would have remembered it. Mr. Collingwood further testified that after Bolmar had been sent for at the board meeting they advised him that if he could deliver the property on terms satisfactory to them the deal could be made. "Mr. Bolmar told me he had twenty-four hours in which to sell Mrs. Crosby's property." The witness informed the board at that meeting that the property would be withdrawn from the market. "I am not sure just how many hours—and that if they wanted to buy it at all that it was necessary to deal for it right then."

J. E. Griest testified that he talked with Bolmar about purchasing the property and informed him that the board would have a meeting the next day and that if he really had authority to sell it he had better be on hand; that the board of directors first decided to purchase the Rowley corner a few minutes before the transaction was completed and when Mr. Bolmar was sent for.

"Q. You may state whether at that board meeting you heard Mr. Quail's name mentioned? A. I did not."

Mrs. Crosby testified that when Mr. Bolmar came to her house the evening before the directors' meeting she told him that she had that afternoon written letters to the different agents who had this property listed, withdrawing it from the market; that Mr. Bolmar said he was sorry as he thought he had a purchaser and requested twenty-four hours more to consummate the deal, "so I told him I would do so. I also withheld the letters I had written to the others and mailed them the next day and Mr. Bolmar had twenty-four hours more, and within that twenty-four hours came and brought me $5,000 to bind the sale"; that the terms were satisfactory and the sale was consummated. She remembered about being called over the telephone by Mr. Quail but said she did not remember when it was—"it wasn't a great while before the sale was made, but he called me over the phone and I told him the price of the property

and of course it was understood if he could sell it or sold it why he had the privilege of doing so." She testified that Mr. Quail never told her over the phone or any other way that the Farm Mortgage Company was a customer of his or was proposing to buy this property; had never notified her of that fact.

There was introduced in evidence the check for $5,000 payable to C. P. Bolmar, agent for Mrs. Crosby; also a copy of the memorandum contract upon which the sale was consummated.

There is no conflict in the evidence as to what each of the agents did to effect a sale. Each had authority to sell; each exhibited the property to the purchaser and urged a sale; each suggested other properties to the mortgage company as suitable for its purposes; there was no interference by Bolmar with the work done by Quail as in *Gregory v. Kennedy,* 82 Kan. 565, 109 Pac. 400, cited by appellee. As said in *Votaw v. McKeever,* 76 Kan. 870, 92 Pac. 1120:

"The real and controlling question is this: Which of these agents earned the commission for making this sale? . . . Who first called the attention of the purchaser to the property or who finally closed the contract by receiving a part payment of the purchase-price or who was most diligent in showing the premises to the purchaser are unimportant facts, except as they tend to support the controlling proposition." (p. 875.)

Under the circumstances of that case it was held to be a question for the jury. But it was said that—

"The rule of law is that that agent is entitled to the commission who is the proximate, efficient and procuring cause of the sale." (p. 876.)

It is true, as stated in the appellee's brief, the fact that Bolmar actually closed the sale does not entitle him to the commission if Quail was the procuring cause of the sale. Until the day before the meeting of the directors of the mortgage company neither of these agents had earned a commission, any more than had the other agents who had been showing the same property to the mortgage company. It is said in the brief for Quail that the only thing Bolmar did was to close a sale previously worked up by Quail; that "the day before the board met, Bolmar stumbled on to Mr. Griest and went over to the board meeting; he kept Mr. Quail away from the board meeting by misrepresentations of fact, innocent or otherwise." There is no testimony to sustain the contention that anything Bolmar did kept Quail away from the meeting. Good faith and fair dealing did not require Bolmar to notify Quail or the other agents that there was to be a board meeting or that the property

was to be withdrawn from sale the next day, and that they could get an extension of twenty-four hours to sell the property; nor did good faith require that he inform Quail of the terms of payment which he had learned would be satisfactory to the mortgage company, and to Mrs. Crosby. When Bolmar stated at the meeting that Mrs. Crosby had given him twenty-four hours in which to sell the property and that it would be withdrawn from the market at that time he stated the truth. He was the only agent who knew this fact or knew the terms upon which Mrs. Crosby would sell, and the terms of payment upon which the company would be willing to purchase. That Quail did not have "the same show that Bolmar had" was his own fault—not Bolmar's.

The controlling fact, about which there is no conflict in the evidence, is, that save for the diligent efforts of Bolmar, the Rowley corner would have been withdrawn from the market before any of the several agents who had the property listed, and who had tried to induce the mortgage company to purchase it, could have effected a sale. Counsel for both parties admit that Bolmar struck while the iron was hot. Up to the time he made the strokes that counted, it may be conceded that he and Quail stood on equal terms, but without Bolmar's efforts the property would have been withdrawn from sale before the minds of the parties were brought together; and no one can do more than speculate as to what might have happened if Bolmar had done no more than Quail did. Therefore, Bolmar, by producing a purchaser ready, able and willing to take the property on terms acceptable to both parties, was the procuring cause of the sale, and as a matter of law is entitled to the commission. Upon the undisputed facts there was nothing to submit to the jury, and the court should have sustained the motion for a directed verdict.

The judgment is reversed and the cause remanded with directions to enter judgment in favor of Bolmar.